UNITED STATES DISTRICT COURT
FOR THE STATE OF NEW JERSEY

| | |
|---|---|
| SIWELL, INC. D/B/A CAPITAL MORTGAGE SERVICES OF TEXAS<br><br>Plaintiff,<br><br>-against-<br><br>ALEXEI VOLOSEVICH, TAMMY SEWELL, JOSEPH JAMES REAL ESTATE, FOUNDATION REAL ESTATE AND CLEAR SKIES TITLE AGENCY LLC,<br><br>Defendants. | **Docket No.: 21-13852**<br><br>**COMPLAINT** |

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, SIWELL, INC. D/B/A CAPITAL MORTGAGE SERVICES OF TEXAS ("Plaintiff"), by their attorneys, Hasbani & Light, P.C., allege as follows:

**I.      INTRODUCTION**

1.      Plaintiff is a mortgage banking firm and loan servicer based in Lubbock, Texas. This action seeks to recover money fraudulently and unjustly obtained by TAMMY SEWELL, ALEXEI VOLOSEVICH, JOSEPH JAMES REAL ESTATE, FOUNDATION REAL ESTATE and CLEAR SKIES TITLE AGENCY LLC (collectively, "defendants") through their Short Sale Scheme.

2.      By this Complaint, Plaintiff brings this action against the defendants for: (a) violations of the federal Rackateer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; (c) unjust enrichment; and (d) tortious interference with a contract.

3.      This action seeks damages of more than $325,009.61, which is the approximate amount owed to Plaintiff based on the money lost as a result of the fake approval for short sale

given by TAMMY SEWELL.

4.      All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

5.      The defendants' fraudulent scheme was designed to defraud servicers and lenders and pay them much less than what would have been authorized under normal circumstances through a short sale.

## II.      THE PARTIES

### A.  Plaintiff

6.      SIWELL, INC. D/B/A CAPITAL MORTGAGE SERVICES OF TEXAS is a corporation duly organized and existing under the laws of the State of Texas.

7.      Plaintiff is the loan servicer for mortgage loans that are guaranteed by Government National Mortgage Association ("Ginnie Mae").

### B.   Defendants

8.      Defendant TAMMY SEWELL is a resident of Texas.

9.      Defendant ALEXEI VOLOSEVICH is a resident of New Jersey.

10.     Defendant JOSEPH JAMES REAL ESTATE has a principal place of business in New Jersey.

11.     Defendant FOUNDATION REAL ESTATE has a principal place of business in New Jersey.

12.     Defendant CLEAR SKIES TITLE AGENCY LLC has a principal place of business in New Jersey.

## III.      JURISDICTION AND VENUE

13.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332 because this is an action asserting a federal question pursuant to The Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, *et seq.*), and pendent and supplemental jurisdiction over its state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper pursuant to 28 U.S.C. § 1391 because one of the RICO Defendants reside in the District.

## IV.     DEFINITIONS AND REGULATORY FRAMEWORK

15.     A mortgage loan is a loan from a financial institution to a borrower for the purchase of a real property, typically a home, which secures the loan. Mortgage loans are often sold by the financial institution that originated the loan, and the final holder of a mortgage loan is referred to as "lender" or "mortgagee." Lenders are financial institutions, such as federally insured banks or mortgage lending businesses. In some cases, the lender is a government-sponsored entity ("GSE"). Federal National Mortgage Association ("Fannie Mae") and the Government National Mortgage Association ("Ginnie Mae") are two examples of GSEs. A servicer handles the administrative functions of a mortgage loan for the lender, such as collecting the borrower's payments and communicating with the borrower. A lender could either be the servicer or have a third party as the servicer.

16.     "Loss mitigation" is a process in which a borrower and a lender or servicer work together to lessen the loss to the lender and to minimize the liability of the borrower resulting from the borrower's default on a mortgage loan. One loss mitigation program is a pre-foreclosure sale, otherwise known as a "short sale," which allows a borrower to give up his or her property without a foreclosure. In a short sale, with the approval of the lender or servicer, a borrower sells his or her home for less than the outstanding balance of the mortgage loan. The

proceeds from the short sale, minus approved closing costs, are generally applied to the outstanding mortgage loan balance owed to the lender, who typically agrees to forgive the borrower's remaining mortgage loan balance.

17.     Prior to approving a short sale, lenders and servicers typically require the preparation of an objective appraisal of the property, either in the form of a broker priceopinion or an appraisal, to compare against the proposed short sale price. In addition, lenders and servicers typically require the parties to a proposed short sale to submit documents and information to show that, among other things, (a) the borrower was unable to pay the mortgage loan; (b) the borrower had listed the property on the open market for a set period of time before accepting the short sale offer; (c) the sale was an "arm's length transaction," defined as one between two unrelated parties without hidden terms or special understandings; and (d) all the funds paid in connection with the short sale were disclosed to the lender or servicer.

18.     The United States Department of Housing and Urban Development ("HUD") was a department of the Executive branch of the federal government. The missionof HUD was to aid individuals and communities in the development and purchase of affordable housing. The Federal Housing Administration ("FHA") was an agency of HUD. FHA provided mortgage insurance to FHA-approved lenders who provided mortgage loans to borrowers that met certain eligibility requirements.

19.     Ginnie Mae is a self-financing, wholly owned U.S. Government corporation within the Department of Housing and Urban Development. It is the primary financing mechanism for all government-insured or government-guaranteed mortgage loans.[1] Ginnie

---

[1] https://www.usa.gov/federal-agencies/government-national-mortgage-association-ginnie-mae. Last Accessed on May 5, 2021.

Mae does not originate loans, rather it guarantees loans making certain risky loans (i.e., for first-time home buyers or low-income borrowers) more appealing to other investors. When a borrower defaults on a mortgage loan backed by Ginnie Mae, Ginnie Mae steps into the shoes of the lender. "All losses on the portfolio that could have been attributed to the Issuer are passed onto Ginnie Mae."[2]

20.     HUD permitted short sales of properties with FHA-insured mortgage loans under its Pre-Foreclosure Sale ("PFS") Program if the lender or servicer determined that the borrower and the short sale transaction met HUD's requirements. Among other things, HUD required the parties to a short sale to certify to the lender or servicer in a Pre-Foreclosure Sale Addendum ("PFS Addendum"), sometimes referred to as a Short Sale Affidavit or an Arm's Length Transaction Affidavit, that the sale was an arm's length transaction characterized by a selling price and other conditions that would prevail in an openmarket environment.

21.     The PFS Addendum typically requires the parties to a short sale to affirm, among other things, that: (1) there were no hidden terms or special understandings between any of the parties involved in the transaction; (2) any relationship or affiliation among the parties involved in the transaction had been disclosed to the lender or servicer; (3)neither the buyer nor the seller would receive any funds or commissions from the sale; (4) there were no current or pending higher offers, or contracts relating to the current sale or subsequent sale of the property that had not been disclosed to the lender or servicer; (5) all amounts paid to any person or entity in connection to the sale were approved and reflected onthe HUD-1 Settlement Statement; and (6) the property had been listed for sale for

---

[2]     https://www.ginniemae.gov/issuers/issuer_training/Summit%20Documents/gnma_gse_differences.pdf.     Last Accessed on May 5, 2021.

a certain amount of time before any offers were evaluated and the presented offer yielded the highest net return to the lender.

22.     Lenders and servicers relied on the parties' representations in the PFS Addendum and other transaction documents to ensure that any short sale of a property with a FHA-insured mortgage loan met HUD's requirements.

23.     Ginnie Mae also issued rules for servicers to follow to obtain approval of short sales of property secured by mortgage loans that Ginnie Mae guaranteed. In addition, Ginnie Mae typically made the approval of a short sale contingent on the prohibition of any resale of the property for 30 days following the short sale closing, and the prohibition of any resale for more than 120 percent of the short sale price for the period beginning 31 days, and ending 90 days, after the short sale.

## V.   OVERVIEW OF THE SHORT SALE SCHEME

24.     In or about and between June 3, 2016 and September 15, 2017, the defendants TAMMY SEWELL, ALEXEI VOLOSEVICH, JOSEPH JAMES REAL ESTATE, FOUNDATION REAL ESTATE and CLEAR SKIES TITLE AGENCY LLC, together with others, conspired to defraud lenders, including Plaintiff, as servicer for Ginnie Mae on certain mortgage loans that were in default (collectively, the "Short Sale Victims") by providing them with false, misleading and incomplete information to induce them to approve short sales at fraudulently depressed prices, thereby causing losses to the lenders, servicers and Ginnie Mae (the "Short Sale Scheme").

25.     TAMMY SEWELL and ALEXEI VOLOSEVICH and several other individuals (collectively, the "Short Sale Co-Conspirators"), worked both together and separately to sell properties at fraudulently depressed prices and then resell or "flip" the properties for large

profits.

26.    The Short Sale Scheme originated under the direction of the defendant ALEXEI VOLOSEVICH with the assistance of the defendants TAMMY SEWELL, and others. ALEXI VOLOSEVICH then replicated the Short Sale Scheme using defendant CLEAR SKIES to "flip" the properties.

27.    In the Short Sale Scheme, the Short Sale Co-Conspirators led by either the defendant ALEXI VOLOSEVICH primarily targeted borrowers who owned homes in New Jersey, and who were in default on their mortgage loans.

28.    With support from TAMMY SEWELL, ALEXEI VOLOSEVICH had the borrowers submit (a) an agreement with him to list the property for sale; (b) an authorization to allow ALEXEI VOLOSEVICH and FOUNDATION REAL ESTATE to negotiate the short sale with the lender on the borrower's behalf; and (c) a contract to sell the property to a third party for a depressed price. These documents were typically sent to the servicer, often located outside of New Jersey, by an electronic mail transmittal that originated from New Jersey, such as an email or facsimile.

29.    After a borrower agreed to sell his or her property in a short sale coordinated by the Short Sale Co-Conspirators, TAMMY SEWELL would approve steeply discounted amounts that went beyond the scope of the HUD requirements for approving short sale amounts.

30.    Money was then wired from the buyer to the servicer, despite the lack of approval from HUD on the short sale amount.

31.    TAMMY SEWELL would then receive a payment, as an incentive, from ALEXEI VOLOSEVICH, for "approving" the short sale and allowing the scheme to carry on.

32.     When the Short Sale Co-Conspirators submitted documentation to obtain approval for a short sale, they provided false, misleading, and incomplete information to the lender or servicer's employee, TAMMY SEWELL. These documents were typically sent to the lender or servicer, often located outside of New York, by a wire transmittal that originated from New Jersey, such as an email or facsimile. Furthermore, the Short Sale Co-Conspirators did not disclose all the past and future payments, including fees and commissions, to be paid to the Short Sale Co-Conspirators, such as TAMMY SEWELL, in connection with the short sale. The money due to the lender from a short sale often was transmitted by a wire transfer to the lender's or servicer's bank account after the closing.

33.     During different and sometimes overlapping periods of time, various groupings of Short Sale Co-Conspirators worked together in the Short Sale Scheme. The defendants TAMMY SEWELL, ALEXEI VOLOSEVICH, JOSEPH JAMES REAL ESTATE, FOUNDATION REAL ESTATE and CLEAR SKIES TITLE AGENCY LLC together with others, worked on fraudulent short sales coordinated by ALEXEI VOLOSEVICH where the primary beneficiaries of the Short Sale Scheme were him and TAMMY SEWELL.

VI.     **SELECT TRANSACTIONS**

34.     The following are examples of short sale transactions executed by the Short Sale Co-Conspirators as part of the Short Sale Scheme.

   A.     35 Norwood Street, Newark, New Jersey 07106

35.     The defendants, together with others, coordinated a short sale transaction to purchase a residence located at 35 Norwood Street, Newark, New Jersey ("35 Norwood"), for a price of $155,361.85 on or about May 4, 2018, as follows:

   a. In or about February 2018, mortgagor/borrower Gayle Scudder ("Scudder")

submitted a request to be reviewed for loss mitigation, specifically a short sale, to Plaintiff as loan servicer for Ginnie Mae. The outstanding debt due to Plaintiff was $341,241.00 as of April 4, 2018.

b. On or about February 15, 2018, Scudder submitted a third-party authorization form to Plaintiff to allow defendant ALEXEI VOLOSEVICH and FOUNDATION REAL ESTATE to speak with Plaintiff on her behalf and to negotiate the short sale of 35 Norwood.

c. On or about January 27, 2018, Plaintiff hired an agent to complete an appraisal who returned a valuation of $175,000.00 for 35 Norwood.

d. 35 Norwood was then sold for $173,000.00 and Plaintiff received $155,361.85.

e. Upon information and belief, defendant CLEAR SKIES TITLE AGENCY acted as agent for the new mortgagee and insured the mortgage for the buyer of 35 Norwood.

B.      140 Badger Avenue, Newark, New Jersey 07106

36.     The defendants, together with others, coordinated a short sale transaction to purchase a residence located at 140 Badger Avenue, Newark, New Jersey ("140 Badger"), for a price of $33,940.00 on or about September 13, 2016, as follows:

a. On or about January 26, 2016, mortgagor/borrower Fahanun Scott ("Scott") submitted a request to be reviewed for loss mitigation, specifically a short sale, to Plaintiff as loan servicer for Ginnie Mae.

b. On the same date, Scott submitted a third-party authorization form to Plaintiff to allow defendant ALEXEI VOLOSEVICH to speak with Plaintiff on her behalf and to negotiate the short sale of 35 Norwood.

9

c. On August 1, 2016, Plaintiff hired an agent to complete an appraisal who returned a valuation of $95,000.00 for 140 Badger (the "August 1, 2016 valuation").

d. On August 8, 2016, defendants ALEXEI VOLOSEVICH and JOSEPH JAMES REAL ESTATE submitted a dispute to defendant TAMMY SEWELL, who was then employed by Plaintiff, in response to the August 1, 2016 valuation. Defendant ALEXEI VOLOSEVICH and JOSEPH JAMES REAL ESTATE argued that the valuation of 140 Badger was closer to $65,000.00.

e. Despite the foregoing valuation by defendants ALEXEI VOLOSEVICH and JOSEPH JAMES REAL ESTATE, 140 Badger sold for $40,000.00 and Plaintiff received $33,940.00 in satisfaction of Scott's mortgage.

f. Upon information and belief, defendant CLEAR SKIES TITLE AGENCY acted as agent for the new mortgagee and insured the mortgage for the buyer of 140 Badger.

g. TAMMY SEWELL never received authority from HUD to accept the $40,000.00 sales price and the $33,940.00 payoff amount, which would have been required by HUD in order to finalize the short sale.

VII. **CAUSES OF ACTION**

A. **CIVIL RICO**

37. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in foregoing Paragraphs of the Complaint with the same force and effect as if more specifically set forth herein.

38.     In connection with the activities giving rise to this action, defendants acted with malice, intent and knowledge, and with a wanton disregard for the rights of Plaintiff and other lenders.

39.     At all relevant times herein, the enterprise described herein operated separately and distinct from each individual defendant. The enterprise consisted of an association in fact of the defendants to implement and conduct the Short Sale Scheme, which has been operated over the course of a few years through the use of mail, wire, and tax fraud, and their application for short sale approval through fraudulent misrepresentations by unsuspecting lenders.

40.     The enterprise was engaged in interstate commerce in that, *inter alia*, ALEXEI VOLOSEVICH, JOSEPH JAMES REAL ESTATE, FOUNDATION REAL ESTATE are residents of New Jersey, TAMMY SEWELL is a resident of Texas and the lenders, which are subject to the scheme of the defendants, are citizens of other states within the United States.

41.     Upon information and belief, the initial capital contributions invested by each defendant forming the enterprise, the Short Sale Scheme, was illicit income derived from a pattern of racketeering activity and their receipt of sales proceeds obtained through fraudulent misrepresentations on short sale applications by unsuspecting lenders after a fraudulent transfer of the property at issue.  Their income also came from the fraudulent sales of properties to other individuals outside of the enterprise.

42.     Upon information and belief, the defendants had each previously set up, operated, invested in and conspired to create other illegal real estate related enterprises to conduct various settlement services that used a pattern of racketeering activity, including obtaining short sale approvals based on false pretenses, to conduct its business and launder money. Each defendant conducted or participated in the conduct of such enterprise's affairs.

43.     At all relevant times herein, in connection with the activities giving rise to this action, the defendants conspired with each other to engage in the various activities set forth herein, agreed to participate in the operation of the conspiracy and scheme to defraud Plaintiff and other lenders, and aided and abetted one another in these activities.

44.     As set forth herein, during the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, the defendants on numerous occasions, used and cause to be used, mail depositories of the United States Postal Service by both placing and causing to be removed mailable matter from said depositories, including but not limited to, HUD-1 Settlement Statements, correspondence, other closing documents, payments, deeds, and original copies of owner's tile insurance policies that fraudulently misrepresented and concealed the true nature of the relationship between the conspirators and concealed the true nature of the services provided by the Short Sale Scheme.

45.     The defendants associated together for a common purpose of engaging in a course of conduct to defraud lenders out of money they are entitled to under notes and mortgages given to them by mortgagors/obligors.

46.     As a result of the foregoing, Plaintiff was injured by this enterprise's scam because it accepted short sale proceeds based on fraudulently misrepresented facts that led to a depressed short sale approval amount. The defendants benefitted from the Short Sale Scheme because they were able to buy the properties for extremely depressed and under-market prices and re-sell the properties at market value (even though they submitted appraisals as part of their short sale application for extremely depressed valuations).

47.     Based on the foregoing, defendants must be found to have violated RICO.

**B.  COMMON LAW FRAUD**

48.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in foregoing Paragraphs of the Complaint with the same force and effect as if more specifically set forth herein.

49.     Defendants knowingly misrepresented facts in the short sale application and as part of the Short Sale Scheme as to the valuation of the properties.

50.     Defendants' intentions were to induce Plaintiff to rely on that misrepresentation and offer steeply discounted payoff amounts as a short sale.

51.     Plaintiff relied on the misrepresentations by defendants when it reviewed the loans for the short sales.

52.     Plaintiff received discounted amounts from defendants as part of the Short Sale Scheme.

53.     Plaintiff was damaged because absent the misrepresentation, it would have been entitled to at least the true market value of the property and at most the total amount due under the respective loan secured by each respective property.

## C.  TORTIOUS INTERFERENCE WITH A CONTRACT

54.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in foregoing Paragraphs of the Complaint with the same force and effect as if more specifically set forth herein.

55.     Plaintiff was the mortgagee and/or loan servicer for the properties at issue in this lawsuit where the borrower/mortgagor was a third party.

56.     Defendants purposefully submitted false documentation with the short sale applications, specifically intending to harm the mortgagor-mortgagee relationship between Plaintiff and the borrower/mortgagor.

57.     Defendants did not have any privilege or justification that would authorize or permit their actions on behalf of the borrower/mortgagor.

58.     As a result of defendants' actions and conduct, actual legal damage resulted to Plaintiff.

59.     Specifically, Plaintiff was entitled to the total amount due under the respective notes and mortgages secured by the properties.

60.     Thus, defendants intentionally interfered with Plaintiff's contract with an intention to defraud Plaintiff from the monies owed to it.

### D.  UNJUST ENRICHMENT

61.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in foregoing Paragraphs of the Complaint with the same force and effect as if more specifically set forth herein.

62.     Defendant TAMMY SEWELL was employed by Plaintiff and she worked with defendant ALEXEI VOLOSEVICH on the short sale applications. ALEXEI VOLOSEVICH was named "authorized third-party" on the accounts of the loans that were being serviced by Plaintiff. Plaintiff communicated with ALEXEI VOLOSEVICH on several occasions and relied upon his statements. ALEXIS VOLOSEVICH paid TAMMY SEWELL for all of the deals approved for short sales.

63.      At Plaintiff's expense, defendants were given approval (albeit unauthorized by Plaintiff) to pay steeply discounted amounts in exchange for a release of the mortgages secured by the properties.

64.     Since Plaintiff relied upon false documentation that were submitted with the short sale application, it would be unjust for defendant to be allowed to retain the benefit without

14

paying additional monies that would have been due to Plaintiff under normal circumstances (namely, an accurate and truthful short sale application).

### E.   NEW JERSEY CONSUMER FRAUD ACT

65.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in foregoing Paragraphs of the Complaint with the same force and effect as if more specifically set forth herein.

66.     Defendants, ALEXEI VOLOSEVICH, JOSEPH JAMES REAL ESTATE, FOUNDATION REAL ESTATE, and CLEAR SKIES TITLE AGENCY LLC, in their role as part of the Short Sale Scheme, used unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of any material fact to induce the sale of the properties to third parties at steeply discounted prices which harmed Plaintiff.

67.     The Short Sale Scheme by defendants misled Plaintiff and stands outside the norm of reasonable business practice in that it will victimize the average consumer. Defendants knew they were deflating the property values and that TAMMY SEWELL was abusing her power in exchange for payments from ALEXEI VOLOSEVICH to give the illusion that the short sales were authorized by Plaintiff and/or its investors, when in fact, they were not.

68.     Absent the Short Sale Scheme, Plaintiff would have been entitled to at least the market value of the properties or the total amount due under the mortgage and note secured by the respective property. In other words, there is a causal relationship between defendants unlawful conduce and the loss to Plaintiff.

### VIII.   DEMAND FOR RELIEF

WHEREFORE, Plaintiff, SIWELL, INC. D/B/A CAPITAL MORTGAGE SERVICES OF TEXAS, respectfully prays that judgment enter in their favor, as follows:

## CAUSE OF ACTION 1

## SHORT SALE SCHEME ENTERPRISE

## (Violations of RICO)

(a)     AWARD Plaintiff's actual and consequential damages to be established at trial;

(b)     AWARD Plaintiff's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## CAUSE OF ACTION 2

## (Common-Law Fraud)

(a)     AWARD Plaintiff's actual damages in an amount to be determined at trial;

(b)     AWARD Plaintiff its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct; and

(c)     AWARD Plaintiff its costs in defending the suits filed by Sharan seeking to cancel the Mortgage; and

(d)     AWARD Plaintiff its costs in prosecuting the foreclosure action against Shirley Roque and

(e)     GRANT any other relief this Court deems just.

## CAUSE OF ACTION 3

## (Tortious Interference with a Contract)

(a)     AWARD Plaintiff's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just.

## CAUSE OF ACTION 4

### (Unjust Enrichment)

(a)     AWARD Plaintiff's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just.

Dated:  New York, New York          **HASBANI & LIGHT, P.C.**
        July 20, 2021

                                    Danielle P. Light, Esq.
                                    *Counsel for Plaintiff*
                                    450 Seventh Avenue, Suite 1408
                                    New York, New York 10123
                                    Tel: (212) 643-6677
                                    dlight@hasbanilight.com